Dennis SULLIVAN, Michael Diskin, James Roseweir, Hershel Heilig, Wayne Jackson, John Clark and John King, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

The CITY OF PITTSBURGH, PENNSYLVANIA, Paul J. Imhoff, Superintendent of the Pittsburgh Bureau of Building Inspections, and Robert H. Lurcott, Director of the Pittsburgh Department of City Planning, Defendants.

Civ. A. No. 85–1228.

United States District Court, W.D. Pennsylvania.

Sept. 23, 1985.

Donald Driscoll, Lee Markovitz, Pittsburgh, Pa., for plaintiffs.

D.R. Pellegrini, Pittsburgh, Pa., for defendants.

ZIEGLER, District Judge.

This is a civil action for declaratory and injunctive relief filed by members of a class of former and recovering alcoholics against the City of Pittsburgh for alleged deprivation of their Fourteenth Amendment rights to equal protection and due process. Plaintiffs are residents of a well-known alcoholic treatment program in the City of Pittsburgh, Pennsylvania, known as The Alcohol Recovery Center (ARC). ARC has provided treatment and shelter to over 20,000 homeless alcoholics for over 19 years at various locations in the Northside section of the City of Pittsburgh. The City has never required a conditional use or occupancy permit.

On July 18, 1983, City Council voted to declare a moratorium on the establishment of group homes within the City following a dispute with the County of Allegheny over the location of such homes. Thereafter, Council voted to deny conditional use approval for continued operation of the ARC program at 1216 Middle Street and 800–820 East Ohio Street. On May 20, 1985, Council rejected the application of ARC to continue operation at a single facility due to community opposition. Plaintiffs filed the instant action contending that the amendment to the City of Pittsburgh Code (Zoning Code) is, in part, unconstitutional on its face, and violative of the Equal Protection

Clause and Rehabilitation Act of 1973, as applied. We hold that the Zoning Code as drafted passes constitutional muster but that the decision of the Council of the City of Pittsburgh to deny the application of ARC for a conditional use violated the constitutional rights of plaintiffs to equal protection of the laws because the decision was not rationally related to any legitimate governmental interest. Plaintiffs have sustained their burden of proof with respect to preliminary injunctive relief and the findings that follow are based on the weight of the credible evidence.

## I. *Findings of Fact*

(1) The Alcohol Recovery Center (ARC) is a non-profit corporation which has provided residential treatment to over 20,000 recovering alcoholics in the Northside section of Pittsburgh since 1966.

(2) The Northside facilities have been located at 422–424 Tripoli Street, 1216 Middle Street and 800, 814, 816, 818 and 820 E. Ohio Street in Pittsburgh. ARC also operates facilities at 1831 Hulton Road, Verona, Pennsylvania and R.D. I, Avella, Pennsylvania.

(3) At present, ARC operates at 800 E. Ohio Street in the City, and the Verona and Avella facilities in the County, with 27, 60 and 19 residents respectively.

(4) The Zoning Code of the City provides that group homes are "conditional uses" which require: (1) an application which is processed by the Planning Department; (2) a public hearing before the Planning Commission which issues a recommendation and (3) approval by the Pittsburgh City Council.

(5) ARC submitted applications to the City of Pittsburgh for conditional use and/or occupancy permits for the Northside facilities on four occasions between 1966 and 1977.

(6) The Council of the City of Pittsburgh never acted upon these applications. The applications submitted in 1977 were processed by the Pittsburgh Planning Commission and recommended for approval.

(7) On March 23, 1977, the City of Pittsburgh through the Mayor, Richard S. Caliguiri, sent a letter to ARC commending it for the work that it was performing.

(8) On September 15, 1980, Title Nine of the Zoning Code was amended by ordinance to provide regulations for conditional use exceptions and to create three categories of group homes based on the number of residents.

(9) The ordinance provides that group homes shall include "group residence" facilities where a maximum of seven clients or nine persons overall, including staff, may reside; "group care" facilities, where a maximum of 17 clients or 19 persons overall may reside; and "institutional" facilities where the number of clients and staff exceeds 19.

(10) "Group homes" are defined as facilities which provide specialized health, social or rehabilitative services to the clients and 24 hour supervision.

(11) The group home ordinance of September 15, 1980 prohibited occupancy in a group residence facility by persons 19 years or older who are serving a sentence for a criminal offense.

(12) The group home ordinance was amended on November 7, 1983 to prohibit occupancy in a group care facility by persons 19 years or older who are serving a sentence for a criminal offense, or under arrest and charged with a felony or any violent crime.

(13) There is no prohibition in the ordinance for occupancy in an institutional facility by persons serving a sentence for a criminal offense or under arrest and charged with a felony or any violent crime.

(14) A building permit, issued by the Bureau of Building Inspections of the City, is required before new construction or substantial repairs or improvements (including electrical work) can be performed on any building in Pittsburgh, including group homes.

(15) If repairs are undertaken without a building permit, the owner and workmen may be subject to criminal prosecution and

the workmen may have their registrations revoked.

(16) On several occasions since 1980, ARC sought building permits to undertake repairs and improvements. The permits were denied.

(17) Before a building permit can be issued, zoning approval must be obtained. A group home must secure a conditional use approved by the Council of defendant.

(18) In 1982, ARC applied for conditional use approval for a "group care" facility at 1216 Middle Street, an "institutional" facility at 800, 814, 816 and 818 East Ohio Street and a "group care" facility at 422 and 424 Tripoli Street. At the time, 142 individuals were residents at the Northside facilities of ARC; the applications sought approval for 99 residents.

(19) Frederick Just, the senior planner of the Planning Department and the person responsible for processing City group home applications, recommended approval for three of seven facilities, including 1216 Middle Street and 800 East Ohio Street, for a total occupancy of 65 residents. The Planning Department also recommended that the City of Pittsburgh allocate $75–100,000 in federally financed money from the Community Development Block Grant for necessary renovations.

(20) The senior planner concluded that such a recommendation would appease neighborhood residents, in which event, the Planning Commission would recommend the three facilities for approval.

(21) Greg Schlinkmann, the person responsible for liaison with the community and employed by the Planning Department, recommended approval for the Tripoli Street buildings (at a reduced capacity) as well as the 1216 Middle Street and 800 E. Ohio Street facilities.

(22) On September 14, 1982, at a public hearing conducted by the Planning Commission with respect to the applications, the East North Side Area Council, a community organization, expressed hostility towards ARC and the presence of recovering alcoholics but agreed to accept as many as two facilities of ARC in the neighborhood.

(23) On May 6, 1983, Charles Cain, the Director of ARC, in response to the order of the Hon. Maurice B. Cohill of this court limiting the population at the Allegheny County Jail and in response to the newly enacted mandatory state sentencing law for persons convicted of driving under the influence of alcohol, publicly stated that ARC would accept DUIs at its Northside facilities.

(24) The East North Side Area Council held a meeting on July 12, 1983, and demanded through Councilman William Robinson that the Council of the City of Pittsburgh close all facilities of ARC.

(25) On July 18, 1983, Council members Woods, Robinson, and Madoff introduced a resolution stating that Council intended to place a moratorium on the establishment of group homes in the City of Pittsburgh, whether funded by the County of Allegheny or State of Pennsylvania, until the County established a mutually acceptable procedure regarding the location of such homes. The resolution was adopted on that date.

(26) The Planning Department has the responsibility of processing money received by the City of Pittsburgh from the federal government for the Community Development Block Grant Program.

(27) On October 25, 1983, Ray Reaves, deputy director of the Planning Department, in an internal memo, recommended that only one ARC facility be approved, (1216 Middle Street), and that $200,000 in Community Development funds be provided to relocate the other residents to an Ohio Township site.

(28) Richard Bruce, Inspection Supervisor of the Bureau of Building Inspections, advised the Planning Commission that 1216 Middle Street satisfied all building codes and was safe.

(29) On October 25, 1983, the Planning Commission recommended approval of the facility at 1216 Middle Street but denied

the Tripoli Street and East Ohio Street locations.

(30) On November 21, 1983, Council rejected all three applications. No hearing was held before that body, and no findings of fact or reasons were given for the rejection.

(31) Like ARC, "institutional facilities" operated by the Salvation Army, Goodwill Industries and the Abraxas Foundation also accepted DUIs. Each was requested by the City to seek new occupancy permits. Each facility, except ARC, chose to return DUIs to the Allegheny County Jail, thereby avoiding a confrontation with the City.

(32) Shortly thereafter, Paul Imhoff, the Director of the Bureau of Building Inspections, ordered ARC to stop accepting persons serving sentences for crimes under the Alternative Housing Program conducted by Allegheny County. ARC continued to accept DUIs.

(33) Frederick Just continued to work with Charles Cain to locate an alternate site for ARC.

(34) The Planning Department considered community opposition to be a determinative factor in site selection for ARC. Mr. Just suggested to Charles Cain that ARC locate in an area removed from residential property to reduce community opposition.

(35) The Planning Department concluded that community opposition had to be considered in selecting alternate sites due to Council's stated opposition to group homes.

(36) ARC considered St. Margaret's Hospital in the Lawrenceville section of Pittsburgh as an alternate site, and the Director sought Community Development funds for renovation of the site. The proposal was rejected by the Planning Department due to anticipated community opposition.

(37) All attempts to relocate the ARC facilities or its residents were met with community hostility. No acceptable alternate site was located by Frederick Just or Elizabeth Pugh, the Director of the Pittsburgh Relocation Agency, a division of the Urban Redevelopment Authority of Pitts-burgh (URA), or Operation Lifeboat, A City-County Task Force, or Charles Cain.

(38) No other facilities in the City of Pittsburgh or County of Allegheny provide the type of services rendered by ARC.

(39) The U.R.A. could not place ARC residents in group care facilities because of prejudice against alcoholics.

(40) The U.R.A. conducted a preliminary study of the feasibility and cost of renovating 800 E. Ohio Street and 1216 Middle Street because no alternate site was available for ARC residents.

(41) The Relocation Director of the U.R.A. determined that it would be more economical to renovate the existing facilities than to relocate the residents, even if an alternate site was available.

(42) Between the adoption of the group home amendment on September 15, 1980, and the enactment of the moratorium on July 18, 1983, City Council approved 16 of the 17 applications for group homes.

(43) Since the moratorium of July 18, 1983, one group home application was approved while nine were denied including Council's rejection on May 20, 1985 of ARC's application for 800 E. Ohio Street.

(44) Of the group home applications submitted since the moratorium, five were recommended by the Planning Commission. Each application which was subject to community opposition was rejected by Council. The only application approved by Council reduced the number of occupants from more than one hundred to twenty, and for that reason was not opposed by the community.

(45) In the fall of 1984, City and County officials and representatives of ARC met to attempt a resolution which would keep ARC at a Northside facility. An agreement was reached which was dependent, at the insistence of the City of Pittsburgh, on the agreement of local community organizations.

(46) The agreement provided for:

(a) a reduction in the number of Northside facilities operated by ARC to one at 800 E. Ohio Street;

(b) a maximum of 50 residents at that facility;

(c) renovations and site improvements to be funded by $100,000 of City and $100,000 of County C.D.B.G. funds, subject to formal approval of the Commissioners and Council;

(d) one-third of the board members of ARC were to be appointed by Council and the Commissioners of Allegheny County with the expectation that community residents would serve, and all ARC staff members would be removed from the Board;

(e) monitoring by the City and County of performance and regular meetings of the ARC Board with the neighborhood groups;

(f) the County would seek funding to hire a new administrative officer;

(g) no DUIs would be placed at the Northside facility, and

(h) the County would invest an additional $100,000 in C.D.B.G. funds to acquire or improve ARC facilities located in the County of Allegheny.

(47) The $100,000 in Community Development funds were available for at least a two-year period.

(48) The City and County representatives had been given informal authority by the City and County administrations to reach a resolution.

(49) ARC officials were unable to obtain the agreement of the East North Side Area Council. The senior planner determined, based in part on past experience with this group, that additional efforts would be futile.

(50) A second community organization, the East Allegheny Community Council, eventually agreed to the proposal; however, the group sought additional concessions including that other ARC properties be sold only with their concurrence.

(51) ARC's Board was reconstituted in September, 1984 and by-laws were adopted which place all decision-making authority with the Board.

(52) The East Allegheny Community Council is funded by the City of Pittsburgh with Community Development Block Grant funds.

(53) If the request for funding of necessary renovations at 800 E. Ohio Street had been processed in the usual manner and without political opposition, approval would have been forthcoming.

(54) The time devoted to the ARC matter by the URA staff, as well as the time that would have been expended assuming the project had proceeded, was paid for by Community Development Block Grant funds.

(55) The City of Pittsburgh has identified the housing needs of handicapped persons to be a special need in its C.D.B.G. Housing Assistance Plan. This Plan is required as part of the application for Community Development Block Grant funds. The Housing Assistance Plan identifies 9,434 non-elderly handicapped persons in need of housing assistance in the City of Pittsburgh.

(56) Following a review of the testimony presented at a public hearing of the Planning Commission on February 5, 1985, the Planning Department recommended that ARC's application be approved for 55 residents. The following conditions were also recommended: that an outside full-time director be hired by the ARC Board within 60 days of approval by Council; three neighborhood residents (one from each of the community organizations and one from the local business association) be appointed to the ARC Board within 30 days of Council's approval; funds for bringing the facility to Code be secured within 90 days of Council's approval; and that a site plan to include a privacy fence, landscaping and recreation area be submitted to the Department of Planning within 30 days of approval.

(57) The Zoning Code group home amendments require that:

(1) an advisory board in part made up of community residents to deal with

community concerns and submit reports which are to be forwarded to the Bureau of Building Inspections;

(2) a semi-annual certification procedure conducted by the B.B.I.; and

(3) failure to comply with conditions set by Council or the procedures required by the Code would be grounds for revocation of an occupancy permit by the Bureau of Building Inspections.

(58) All of the conditions and requirements for zoning approval were met in the 800 East Ohio Street application.

(59) The property at 800 E. Ohio Street is located in a C–3 commercial district. Under the open space requirements normally applicable in C–3 districts, (Ordinance at § 955.05(7)), a building may not cover more than 60 percent of the total lot. However, the site plan process is applicable to institutional facilities such as ARC in C–3 districts. (Ordinance at §§ 955.06 and 955.04). The 800 E. Ohio Street building covered only 33 percent of the lot (5,352 square feet of building on 16,217 square feet of total ground). Under either procedure, ample open space was available.

(60) The Zoning Ordinance also addresses "impaction" or spacing concerns. For example, group care facilities cannot be located within one-quarter mile and group residence facilities cannot be located within one-half mile of other such facilities or an institutional facility or an outpatient drug and alcohol clinic. ARC's application met such spacing requirements.

(61) No evidence was submitted at the public hearings of February 5 or September 14, 1982 conducted by the Planning Commission that nearby property values would be diminished if ARC occupied 1216 Middle Street or 800 E. Ohio Street.

(62) Based on the lack of proof and experience with other established group homes, Frederick Just concluded that property values would not depreciate.

(63) The Planning Department concluded that, in light of the reduction in buildings and clients, the performance conditions recommended, and the semi-annual recertifica-

tions, the surrounding area would not be negatively affected by the proposal.

(64) One factor considered in recommending approval of 800 E. Ohio Street was the negative impact on the surrounding area if ARC were to close and the residents returned to the streets.

(65) But for the provision of supervision and treatment, the ARC facility at 800 E. Ohio would be eligible for zoning approval as a lodging house without approval by Council.

(66) The Neighborhood Commercial Improvement Program is a C.D.B.G. funded program for building improvements within targeted areas. The East Ohio Street commercial district is an eligible target area up to but not including 800 E. Ohio Street.

(67) Certain administrative activities of the Department of Planning, including those activities of the senior and community planner which involve non-profit organizations serving low income persons such as ARC, are paid by C.D.B.G. funds.

(68) ARC provided a valuable service to the Court of Common Pleas of Allegheny County, Pennsylvania by offering treatment without total confinement to those with a drinking problem who are convicted of driving while under the influence of alcohol.

(69) Alcoholism is defined by the medical and psychiatric professions as a disease which is both disabling and a handicap.

(70) Alcoholics who are drinking alcoholic beverages are subject to severe physical and psychological deterioration. An alcoholic is never fully cured. Even after years of sobriety, a return to drinking results in a resumption of the destruction previously experienced.

(71) The medical profession has concluded that in many instances there may be a propensity towards alcoholism which is inherited or otherwise inately acquired.

(72) Societal prejudice has existed historically with respect to alcoholics, including a resistance among many people to accept

recovering alcoholics within the community.

(73) The evidence preponderates that a recovering alcoholic is as likely to be a responsible citizen and good neighbor as a non-alcoholic person.

(74) Group residential treatment plays an essential role in the recovery of a substantial number of alcoholics.

(75) The structured setting of a residential treatment program, and the mutual support provided by the residents is an important aspect of treatment.

(76) The residents of ARC are forbidden to use alcohol. Unless inconsistent with other prescribed medication, residents must take Antabuse, which causes discomfort if alcohol is consumed within seven days. Residents must participate in group and individual therapy sessions. They must earn gradual and decreasing restrictions on their outside activities. There is 24-hour supervision including hourly inspections of the building.

(77) The location of a group residence in a community is important to the re-entry of an alcoholic into the community, to the availability of jobs and community services, and to a sense of self-worth.

(78) ARC has been an important resource to alcoholics who have been discharged from alcohol treatment programs administered by various hospitals in this community.

(79) Except for St. Johns and St. Francis Hospitals, hospitals in the Pittsburgh area are not reimbursed for providing extended treatment to alcoholics; alcoholics are often discharged without extended treatment for their alcoholism.

(80) In January, 1985, ARC was compelled to agree to decline new residents until conditional use approval and an occupancy permit was approved. Since then, ARC has been forced to decline to admit approximately seven alcoholics per month without treatment and others who were referred by various hospitals.

(81) If ARC is required to close, it is likely that the present residents will return to drinking with the danger of physical and psychological deterioration and perhaps death.

(82) If ARC closes, the population of homeless street people in the City of Pittsburgh will likely increase by 10 to 20 percent. A substantial number of these people are alcoholics.

(83) Street people place heavy demands on municipal services such as fire protection, police and emergency medical care.

(84) A substantial number of vacant buildings are occupied by street people from time to time, thereby increasing the risk of fire and danger to firemen, neighboring community residents and the street people themselves.

(85) There is a need for additional group residential treatment facilities for recovering alcoholics in the neighborhoods of the City of Pittsburgh and on the Northside in particular.

(86) The building at 800 East Ohio Street does not meet the Pittsburgh Building and Fire Codes. However, this is not relevant to conditional use approval. It is relevant to the issuance of an occupancy permit after approval of a conditional use.

(87) Approximately $60,000 in renovations are required to bring the building to the standards of the Building and Fire Codes.

(88) Allegheny County has committed $100,000 for building and site improvements at 800 East Ohio Street upon condition that the City of Pittsburgh grant conditional use approval.

(89) City Council has denied the ARC applications and other group home applications since July, 1983, because Council perceives an inbalance between group homes in the City and the County and that more group homes should be established without the City.

(90) The evidence established that there is no inbalance between the number of group homes in the City of Pittsburgh and the number of group homes in the County of Allegheny, particularly when the num-

ber of persons in need of such homes from the City is considered.

(91) Council has stated that group homes will no longer be established in the City until the County of Allegheny enters into a mutually acceptable agreement to locate more group homes in the County.

(92) Council has determined and communicated to the Planning Department, group home providers, and residents that neighborhood opposition to group homes will be cause for denial.

(93) The Board of the Catholic Institute of Pittsburgh, which owns the property located at 800 East Ohio Street, has agreed to donate the property to ARC so long as the premises continue to be used for charitable purposes.

(94) The treatment received at ARC permits a number of present residents to receive public assistance. If forced to move from ARC, public assistance may be terminated.

(95) The evidence established that the decision of the Commonwealth of Pennsylvania to revoke the license of ARC at 800 East Ohio Street was based on the conditions which existed subsequent to the unconstitutional decision of the City of Pittsburgh to deny building permits and conditional use approval to ARC.

(96) If the City of Pittsburgh had granted building permits to enable ARC to undertake repairs and renovations at 800 East Ohio Street, and granted the conditional use application at the facility, necessary repairs would have been undertaken to meet all requirements of the Department of Health of the Commonwealth of Pennsylvania.

(97) The decision of the Council of the City of Pittsburgh to deny the applications of ARC for conditional use approval at 1216 Middle Street and 800 East Ohio Street violated the constitutional rights of plaintiffs to equal protection of the laws guaranteed by the Fourteenth Amendment.

(98) The equitable ejectment action filed by the City of Pittsburgh against Charles Cain and ARC House, Inc., at 6D–84–6120

in the Court of Common Pleas of Allegheny County, Pennsylvania constitutes neither a bar to the assertion of plaintiffs' federal rights nor a bar to the motion of ARC to intervene.

(99) Plaintiffs federal claims are not barred by the state court action because (a) they were not parties to the action; (b) they had no duty to intervene; (c) there was no final state court judgment on the merits; (d) the instant cause of action arose subsequent to the state court litigation; (e) the doctrine of claim and issue preclusion is not applicable; and (f) 28 U.S.C. § 1738 is inapposite.

(100) The federal claims of ARC are not barred by the state court action because (a) the consent decree of January 14, 1985 was not a final state court order; (b) the federal claims of ARC were not, and could not have been raised within the scope of the state court proceeding instituted by the City of Pittsburgh; (c) ARC's federal claims arose subsequent to the state court litigation; (d) the doctrine of claim and issue preclusion is not applicable; (e) 28 U.S.C. § 1738 is inapposite; and (f) abstention is not warranted.

(101) The motion of ARC to intervene must be granted and, for the reasons rehearsed, we conclude that the decision of the Council of the City of Pittsburgh to deny the applications of ARC for conditional use approval at 1216 Middle Street and 800 East Ohio Street violated the constitutional rights of ARC to equal protection of the laws guaranteed by the Fourteenth Amendment.

II. *Conclusions of Law*

(1) This court has jurisdiction by reason of 28 U.S.C. § 1343(3) and (3) and 28 U.S.C. § 1331.

(2) Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201–2202.

(3) Abstention is not warranted, under the circumstances, because plaintiffs have a right to assert federal claims in a federal forum. Moreover, plaintiffs are not parties to any ongoing state proceeding

in which their constitutional claims can be raised or complete relief obtained. *New Jersey-Philadelphia Presbytery v. New Jersey State Board*, 654 F.2d 868 (3d Cir. 1981).

■ (4) Plaintiffs' claims are not barred by *res judicata* under federal or state law because: (1) they are not parties to any previous state court actions involving the matters here asserted, *Duquesne Slag Products Co. v. Lench*, 490 Pa. 102, 415 A.2d 53 (1980); (2) there is no final judgment on the merits with respect to any claim now asserted which is entitled to full faith and credit under 28 U.S.C. § 1738, *Wade v. City of Pittsburgh*, 765 F.2d 405 (3d Cir.1985), *New Jersey-Philadelphia Presbytery v. New Jersey State Board, supra;* (3) the January 1985 consent order in the Court of Common Pleas of Allegheny County, Pennsylvania at No. 6D 84-6120 is not binding on plaintiffs here because they were non-parties, *Sabatine v. Commonwealth of Pennsylvania*, 497 Pa. 453, 442 A.2d 210 (1982); (4) the state court order did not encompass plaintiffs' causes of action, *In re Jones & Laughlin Steel Corp.*, 328 Pa.Super. 442, 477 A.2d 527 (1984); and (5) previous state court orders and litigation between ARC and the City cannot bar plaintiffs' claims based on Council's action of May, 1985, because the instant cause of action arose thereafter. *Harris v. Pernsley*, 755 F.2d 338 (3d Cir.1985).

(5) Plaintiffs were not required to intervene in any civil actions filed by or against ARC House in state court. *New Jersey-Philadelphia Presbytery v. New Jersey State Board, supra; Bannard v. New York State National Gas Corp.*, 404 Pa. 269, 172 A.2d 306 (1961).

■ (6) The City of Pittsburgh, by the July 1983 declaration of Council that further group homes funded by the County of Allegheny or Commonwealth of Pennsylvania would not be permitted in the City of Pittsburgh, violated the right to equal protection of the instant class of handicapped persons who need to reside and receive rehabilitative services in a group facility. *City of Cleburne, Texas v. Cleburne Living Center*, —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

(7) The declared moratorium of July 18, 1983 chilled the exercise of constitutional rights of the instant class of handicapped persons in need of residential and rehabilitative services in a group facility and those organizations, such as ARC, which are organized for the purpose of meeting the needs of such handicapped persons.

(8) The action of the City of Pittsburgh in rejecting the applications of ARC for conditional use of the facilities at 1216 Middle Street and 800 E. Ohio Street was not rationally related to a legitimate governmental purpose. *City of Cleburne, supra* at ——, 105 S.Ct. at 3257; *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

(9) The City of Pittsburgh had no legitimate interest in excluding the instant class of handicapped persons in need of residential and rehabilitative services at the facilities in dispute due to opposition based on unfounded fear, speculation and prejudice. *City of Cleburne, Texas v. Cleburne Living Center, supra; J.W. v. City of Tacoma, Washington*, 720 F.2d 1126 (9th Cir. 1983).

(10) The City of Pittsburgh had no legitimate interest in excluding the instant class of handicapped persons in need of residential and rehabilitative services at the facilities in dispute due to the perceived failure of a separate legal entity, i.e., the County of Allegheny, to locate additional group homes without the City.

(11) To the extent that the number of group homes in the City of Pittsburgh is a legitimate concern, defendant legislated this concern by prohibiting the location of a group residence facility within one half mile of another group residence, a group care facility, an institutional facility or an outpatient drug and alcohol clinic, and by prohibiting the location of a group care facility within one quarter mile of such facilities or clinics. ARC's applications are not inconsistent with this legitimate requirement.

(12) The City of Pittsburgh had no legitimate interest in denying the application for 800 E. Ohio Street because it might impede the normal and orderly development of surrounding properties and impair neighboring property values absent some demonstration that such an occurrence would be caused by something more than unfounded fears, speculation or prejudice. *J.W. v. City of Tacoma, supra.*

(13) No evidence was presented at the hearing before Council on February 5, 1985 or before this court that the presence of ARC would impede the orderly development of neighboring properties or reduce property values, although the resolution of Council was grounded on such reasoning. Indeed, the staff of the Planning Department opined that presence of ARC would not impede development or reduce property values, and the evidence before this court is to the same effect.

(14) There was no evidence presented at the hearing before the Planning Commission or before this court to substantiate any limitation on lot area or side yard dimension causing a deficiency in recreation area and open space for adequate light, air and noise dispersion. On the contrary, the testimony at both hearings established that all zoning requirements were met and that ample open space was available.

(15) The reasons cited for the resolution of Council to deny the application of ARC are pretextual.

(16) None of the reasons offered by defendant for denying ARC's application—building code violations and license review—are relevant to approval of a conditional use; these concerns are relevant only to an occupancy permit.

(17) Council's discretion to deny a conditional use is sharply limited under state law. A conditional use is a permitted use, unless the objectors prove that approval is likely to substantially affect the health and safety of the community in an adverse manner. *Robinson Township v. Westinghouse Broadcasting Co.,* 63 Pa.Cmwlth.

510, 440 A.2d 642 (1981). No such evidence was presented to council.

(18) Statutory classifications which affect the mentally retarded must be rationally related to a legitimate governmental purpose. *City of Cleburne, Texas v. Cleburne Living Center,* —— U.S. at ——, 105 S.Ct. at 3257 (1985). Recovering alcoholics are entitled at least to the same standard of judicial review.

(19) Recovering alcoholics have been: (1) victims of historic prejudice; (2) saddled with a disability; (3) members of an immutable class; and (4) relatively politically powerless. *Medora v. Colautti,* 602 F.2d 1149 (3d Cir.1979).

(20) Access to treatment in a group residential facility is essential to effective treatment of recovering alcoholics and their reintegration into society.

(21) Although the Pittsburgh Zoning Ordinance does not refer specifically to alcoholics or recovering alcoholics, the decision of Council to single out the individuals living at the group residential facilities of ARC, at these particular locations, and receiving health, social or rehabilitative services, is an unconstitutional application of the Ordinance because it effectively discriminates against plaintiffs; burdens their access to appropriate treatment; and under the circumstances, is unrelated to any rational governmental purpose.

(22) It is not a valid justification for a discriminatory application of an ordinance that other groups of handicapped persons in need of residential and rehabilitative services in a group facility also are subject to discriminatory treatment.

(23) The application of the Zoning Ordinance with regard to ARC's applications violated plaintiff's right to equal protection of the laws. *City of Cleburne, Texas, supra; J.W. v. City of Tacoma, supra.*

(24) In failing to demonstrate or even articulate any rational relationship to an important governmental purpose or interest in denying the applications at 1216 Middle Street and 800 E. Ohio Street, the

City acted in an arbitrary manner in violation of plaintiff's rights to substantive due process, *J.W. v. City of Tacoma, supra,* in addition to the right to be treated equally by the law.

(25) The City of Pittsburgh is a recipient of federal financial assistance in the form of Community Development Block Grant funds.

(26) These funds assist various forms of community development, nearly all of which require zoning approval before they can proceed.

(27) In withholding zoning approval to plaintiffs, a class of handicapped persons who need to reside and receive rehabilitative services in a group facility, the City of Pittsburgh discriminated against the class of otherwise qualified persons in violation of the Rehabilitation Act of 1973, 29 U.S.S. § 794. Plaintiffs have established that they are (a) handicapped individuals; (b) otherwise qualified for benefits from which they have been excluded; (c) solely because of their handicap; and (d) the program is subject to § 504. *Strathie v. Department Trans.,* 716 F.2d 227 (3d Cir.1983). Defendant failed to establish that its actions were either substantially justified or reasonable. *Id.* at 230.

(28) But for community opposition, the City of Pittsburgh directly or through the Urban Redevelopment Authority would have spent $100,000 of Community Development Block Grant funds to renovate the ARC facility at 800 E. Ohio Street.

(29) The City of Pittsburgh failed to reasonably accommodate the handicap of those who require group residence and rehabilitative services by denying the application for zoning approval of the ARC facilities at 800 E. Ohio Street and 1216 Middle Street when all enumerated and enforceable conditions suggested, in part, by defendant's officials were satisfied. *Nelson v. Thornburgh,* 567 F.Supp. 369 (E.D.Pa. 1983), *affd.* 732 F.2d 146 (3d Cir.1984).

■ (30) Plaintiffs' contention that the Zoning Ordinance is violative of the Four-

teenth Amendment on its face is without merit.

■ (31) The motion of ARC to intervene must be granted because the claim of ARC meets the test Fed.R.Civ.P. 24(b) and the federal claims of intervenor are not barred under federal or state law for the following reasons: (a) the consent decree of January 14, 1985 in the Court of Common Pleas of Allegheny County, Pennsylvania was not a final state court order adjudicating the constitutional claims of ARC; (b) the federal claims of ARC were not, and could not have been raised within the scope of a state court eviction proceeding, as the able state court judge noted; (c) ARC's federal claims arose from the acts of Council, i.e., administrative rulings, and an unappealed administrative ruling is not entitled to full faith and credit under 28 U.S.C. § 1738, *Kremer v. Chemical Const. Corp.,* 456 U.S. 461, 470, 102 S.Ct. 1883, 1891, 72 L.Ed.2d 262 (1982); (d) the doctrine of claim or issue preclusion is inapplicable under state or federal law; and (e) abstention is not warranted. *Wade v. City of Pittsburgh,* 765 F.2d 405 (3d Cir.1985).

■ (32) The decision of the Council of the City of Pittsburgh to deny the applications of ARC for conditional use approval at 1216 Middle Street and 800 E. Ohio Street violated the constitutional right of ARC to equal protection of the laws and due process guaranteed by the Fourteenth Amendment for the reasons rehearsed.

(33) The request of plaintiffs for a judgment declaring that the zoning ordinance of September 15, 1980 is unconstitutional on its face must be denied.

(34) Plaintiff and intervenor are entitled to preliminary injunctive relief because plaintiffs have established by a preponderence of the evidence that: (1) they are likely to succeed on the merits; (2) they are subject to irreparable harm pendente lite; (3) defendants will suffer no harm from the grant of an injunction; and (4) the public interest requires that plaintiffs be accorded relief. *Constructors Association of West-*

*ern Pennsylvania v. Kreps,* 573 F.2d 811 (3d Cir.1978).

### III. *Injunctive Relief*

(35) Plaintiffs and intervenor are entitled to a preliminary injunction requiring the City of Pittsburgh to grant to ARC a conditional use approval for a group care facility at 1216 Middle Street, and a conditional use approval for an institutional facility at 800 E. Ohio Street.

(36) Plaintiffs and intervenor are entitled to a preliminary injunction requiring the City of Pittsburgh to grant building permits to ARC to undertake repairs and renovations at 1216 Middle Street and 800 E. Ohio Street to bring those facilities into compliance with Electrical, Fire and other relevant Codes, if any.

(37) Plaintiffs and intervenors are entitled to a preliminary injunction requiring the City of Pittsburgh to grant occupancy permits to ARC at the two facilities without undue delay, following compliance by ARC with all Electrical, Fire and other Codes, if any, which permits shall not be unreasonably denied by the City.

(38) Plaintiffs and intervenors are entitled to a preliminary injunction requiring the County of Allegheny and the City of Pittsburgh to appropriate and deposit in an appropriate account, within 90 days, the sum of $50,000 each, or a total sum of $100,000 of Community Development Block Grant funds to enable ARC to undertake the necessary repairs and renovations at the two facilities to bring those structures into compliance with all applicable codes, without undue delay.

(39) The sum of $100,000 shall be placed in an appropriate account at Mellon Bank, N.A., in the name of Donald Driscoll, Esquire, counsel for Neighborhood Legal Services Association, as trustee for ARC, to finance the necessary repairs, or renovations. Counsel and the NLS shall at all times be jointly and severally responsible and accountable for the aforesaid funds, and shall indemnify the payors in the event of any loss.

(40) No payment shall be made for necessary repairs unless approved by Donald Driscoll, Esquire, and counsel shall advise the court of all expenditures in a monthly written progress report.

(41) After initial code repairs have been completed, the County of Allegheny and the City of Pittsburgh shall appropriate additional Community Development Block Grant funds to finance renovations and site improvements at 800 E. Ohio Street to permit ARC to provide services to no more than 50 residents at the facility.

(42) The aforesaid site plan shall include, with respect to 800 E. Ohio Street, a privacy fence, landscaping, exterior renovations on E. Ohio Street, and a recreation area.

(43) The City and County may require ARC to execute documents as are typically required of CDBG recipients, provided that nothing contained therein shall be inconsistent with these findings and conclusions of law.

(44) Counsel for plaintiffs shall submit to the court within 10 days an appropriate preliminary injunctive decree which incorporates the aforesaid relief, as well as additional relief which may be appropriate.