PUBLISH

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

No. 97-4901

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/05/98
THOMAS K. KAHN
CLERK

D.C. Docket No. 86-6926-CV-KMM

BANNUM, INC.,
BANNUM PROPERTIES, INC.,

Plaintiffs-Appellants,

versus

CITY OF FORT LAUDERDALE, FLORIDA,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

**(October 5, 1998)**

Before HATCHETT, Chief Judge, BLACK, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

HATCHETT, Chief Judge:

Appellants Bannum, Inc. and Bannum Properties, Inc. filed this action pursuant to 42 U.S.C. § 1983 against appellee, the City of Fort Lauderdale, Florida (the City), alleging equal protection and due process violations in connection with the City's enactment and enforcement of a zoning ordinance. The district court granted summary judgment in favor of the City, finding that the ordinance at issue was rationally related to the achievement of legitimate state interests. We affirm.

## I. FACTS

A detailed account of the events giving rise to this lawsuit may be found in our prior opinion in this case and in the district court's summary judgment order. See Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 990-95 (11th Cir. 1990); Bannum, Inc. v. City of Fort Lauderdale, 996 F. Supp. 1230, 1231-34 (S.D. Fla. 1997). Therefore, we provide only a brief factual overview.

Bannum, Inc. and Bannum Properties, Inc. (collectively Bannum) are Kentucky corporations that work in cooperation with the United States Bureau of Prisons to provide supervised residential programs for ex-offenders. In January 1985, the Bureau of Prisons awarded Bannum a contract to establish a community treatment center (CTC) in Fort Lauderdale, Florida. Generally, the program participants were federal prisoners that had been convicted of nonviolent white collar crimes and were serving the last stages of their sentences before release. The CTC agreed to provide housing and job placement services in an effort to assist the participants in resuming their lives outside of prison as productive members of society.

Bannum filed an application with the City for an occupational use license to operate its center. Bannum also sought to lease rooms at the Areca Palms Motel (Areca Palms) in Fort

2

Lauderdale to house the CTC participants. In April 1985, the City zoning authorities approved

Bannum's application for the use license on the condition that Bannum move its office facilities

to a commercial zone and obtain a separate license. Bannum complied, leased rooms at the

Areca Palms and commenced operation of its center.

In December 1985, after receiving complaints from City residents, the Fort Lauderdale

Code Enforcement Board issued Areca Palms owner Gordon Johnson a notice of violation of

Section 47-11.1.1(d) of the Fort Lauderdale Code of Ordinances, which requires a special use

permit for the operation of a "custodial facility" within the City.[1] Although the City's code

---

[1] The ordinance provides as follows:

> Whenever . . . any land is proposed to be used for:
>> (a) Homes for the care of the aged, including nursing homes;
>> (b) Homes or centers for the care, boarding or teaching of children;
>> (c) Boarding or rooming houses;
>> (d) Custodial facilities, other than detention facilities, . . . such as emergency shelter care facilities, residential child care facilities, adult congregate living facilities, group homes, residential habilitation centers, drug abuse treatment and educational centers, and other similar uses;
>
> No permit shall be issued and no land shall be used for such purpose until the use . . . has been approved by resolution of the city commission, after a recommendation by the planning and zoning board[,] . . . [which entities] shall . . . consider[] . . . the following factors:
>> (1) Impact on the abutting properties from the proposed facility;
>> (2) The extent to which the proposed facility will serve existing needs within the community;
>> (3) Compatibility of the proposed facility with existing land uses in the surrounding neighborhood;
>> (4) Conformance by the proposed facility with all

contained the "custodial facility" designation at the time Bannum initially sought and obtained licensing, Bannum did not specifically apply for a special use permit. Faced with threats of daily fines for violating the zoning ordinance, Areca Palms ordered Bannum to vacate the rooms assigned to it. Johnson, however, maintained that the CTC did not constitute a "custodial facility" and appealed the citation to the Board of Adjustments, which held a meeting in February 1986 and denied relief. The following month, while Johnson was in the process of appealing the Board of Adjustments' decision to the Circuit Court of Broward County, the Bureau of Prisons removed the CTC participants from Areca Palms.

Bannum worked with city officials during the next seven months to locate an alternate site to house the CTC participants. Upon finding a suitable location, Bannum filed an application with the Planning and Zoning Board to secure a special use permit to operate the CTC at the alternate site. At a hearing in October 1986, the Planning and Zoning Board informed Bannum that it would not issue a special use permit unless Bannum provided the police department with the names and status of the ex-offenders that would be housed at the center. The Bureau of Prisons would not authorize Bannum to disclose such information, and the Planning and Zoning Board eventually recommended the denial of Bannum's application.

In response to Bannum's subsequent submission of a revised application for a special use permit, the City Commission sent Bannum a letter expressing its opinion that "the City has accommodated a disproportionate share of social service facilities[.]" The letter also stated the reasons that the City decided to condition Bannum's receipt of a special use permit upon

applicable federal, state, and local laws and regulations.

Fort Lauderdale, Fla., Code § 47-11.1.1 (1985).

4

Bannum's providing information about the CTC participants: essentially, the City wanted the right to "reject" proposed participants "based upon legitimate concerns for community safety." The letter also stated some apprehensiveness regarding the possibility that Bannum's center may house participants that had been "involved with control[led] substances" or "diagnosed as psychotics[.]" Ultimately, Bannum lost its contract with the Bureau of Prisons due to its failure to obtain the required zoning permit to operate the CTC.

**PROCEDURAL HISTORY**

Bannum commenced this action against numerous defendants, including the City and other city administrative boards and officials. The complaint alleged violations of 42 U.S.C. §§ 1981, 1983 and 1985, as well as Article VI and the Fifth and Fourteenth Amendments to the United States Constitution. The defendants moved to dismiss the action, arguing that they were entitled to absolute, qualified and municipal immunity. Treating the motion to dismiss as one for summary judgment, the district court granted the motion as to all defendants. Bannum appealed the immunity ruling as to the City only, and this court vacated that portion of the district court's judgment. Bannum, 901 F.2d 989 (11th Cir. 1990). On remand, after further discovery, Bannum and the City filed cross motions for summary judgment on Bannum's constitutional claims. The district court granted summary judgment in favor of the City, and this appeal followed.

**II. ISSUE AND STANDARD OF REVIEW**

The issue presented in this appeal is whether section 47-11.1.1(d) of the Fort Lauderdale Code of Ordinances, either as written or as applied, violated Bannum's constitutional rights to equal protection or due process of law.

We review the district court's summary judgment ruling <u>de</u> <u>novo</u>, applying the same legal standard that the district court employed in the first instance.  <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918-19 (11th Cir. 1993).

### III.  DISCUSSION

#### A.      The Rational Basis Test

Section 47-11.1.1(d) of the Fort Lauderdale Code of Ordinances neither targets a protected class nor implicates fundamental rights.  Accordingly, we apply the rational basis test to Bannum's equal protection and due process claims.[2]  <u>See</u> <u>Georgia Manufactured Hous. Ass'n, Inc. v. Spalding County, Georgia</u>, No. 97-8207, slip op. at 3721 (11th Cir. Aug. 6, 1998).  In short, the City must prevail if section 47-11.1.1(d) is rationally related to the achievement of some legitimate government purpose.  <u>Georgia Manufactured Hous. Ass'n</u>, slip op. at 3721.

Under rational basis review, our inquiry is twofold.  First, we must "identify[] a legitimate government purpose–a goal–which the enacting government body <u>could</u> have been pursuing."  <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995).  For purposes of Bannum's case, it is particularly significant that "[t]he <u>actual</u> motivations of the enacting governmental body are entirely irrelevant."  <u>Haves</u>, 52 F.3d at 921.[3]    Second, we must "ask[]

---

[2] "[T]he rational basis inquiry is the same for equal protection and substantive due process challenges to zoning."  Restigouche, Inc. v. Town of Jupiter, 59 F.3d 1208, 1214 n.6 (11th Cir. 1995).

[3] In an apparent effort to unveil what it believes to be the City's improper motivation, Bannum places great emphasis on the fact that the City initially allowed the CTC to operate for nearly one year before deciding to cite Areca Palms with the "custodial facility" zoning violation.  Because the governing body's motive is irrelevant for purposes of rational basis review, we are not at liberty to attach any legal significance to the timing of the City's decision to enforce its zoning ordinance in this case.

whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." Haves, 52 F.3d at 922. Thus, section 47-11.1.1(d) survives rational basis scrutiny "[a]s long as [the] reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational[.]" Haves, 52 F.3d at 922 (internal quotation and citation omitted).

B.      **Bannum's Constitutional Claims**

Bannum contends that section 47-11.1.1(d) is unconstitutional as applied because negative attitudes and irrational fears about the CTC participants motivated the City's decision to enforce the "custodial facility" provision. Bannum also contends that the ordinance is unconstitutional on its face because it arbitrarily singles out social service programs for differential treatment, requiring that they obtain a special use permit in order to operate, while declining to impose such a burden on other similar uses of property–such as multi-family residences, apartment houses, motels, hotels, foster homes, mobile home parks, convents and fraternity houses.

With respect to the first prong of the rational basis test, the City advances several "legitimate state interests" that it claims to have been pursuing in enacting section 47-11.1.1(d), and in requiring Bannum to obtain a special use permit to operate its CTC. These "general welfare" interests include public safety and conservation of municipal resources. We have little doubt that these interests qualify as "legitimate" for purposes of rational basis review. See Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1387 (11th Cir. 1993) (approving of "safety" and "effect on city services" as permissible bases for imposing land use restrictions), cert. denied,

7

511 U.S. 1018 (1994); see also Bannum, Inc. v. City of St. Charles, 2 F.3d 267, 271 (8th Cir. 1993) (approving of overall "public welfare" as legitimate rationale to support municipal zoning scheme under facts similar to the present case).

We also conclude that the second prong of the rational basis test is satisfied, as the enactment and enforcement of section 47-11.1.1(d) is sufficiently related to the above-stated municipal interests. Generally, the City's decision to require certain social service programs to obtain special approval was not arbitrary. Rather, this decision could have been premised upon differences in the ways in which such facilities would operate in comparison to other types of land uses that are not subject to the restriction. Enacting the ordinance enabled the City to control the placement of certain social service programs, thereby furthering the City's goals. Regarding the application of the ordinance to Bannum specifically, it was not irrational for the City to have concerns about whether the ex-offenders housed at the CTC would either pose some threat to the surrounding community or exacerbate the City's perceived burden in accommodating a disproportionate share of social service programs. Thus, the City could reasonably have believed that applying the "custodial facility" designation to Bannum's CTC would further its interests in conserving municipal resources and protecting the public.

The Supreme Court's decision in City of Cleburne, Texas v. Cleburne Living Center, Inc., 473 U.S. 432 (1985), upon which Bannum primarily relies, does not undermine our conclusion that section 47-11.1.1(d) survives rational basis scrutiny. In Cleburne, the Court held that a city requiring a special use permit for the operation of a group home for the mentally retarded violated the Equal Protection Clause, as applied to the facts of that case, because the requirement "appear[ed] . . . to rest on an irrational prejudice against the mentally retarded[.]"

8

<u>Cleburne</u>, 473 U.S. at 450. The Court stated that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." <u>Cleburne</u>, 473 U.S. at 448.

We assume, but need not decide, that under <u>Cleburne</u>, the City's attempt to respond to the community's "negative attitudes" toward the CTC participants was an illegitimate governmental purpose, thus failing the first prong of our rational basis inquiry.[4] Nevertheless, the City must still prevail since such community input was not the <u>sole</u> reason for the City's actions. Although Bannum presented evidence tending to indicate that the community's "negative attitudes" may have influenced the City's decision to some degree, the City also had at least two legitimate municipal interests–conservation of resources and public safety–that it could have sought to further through its enforcement of the ordinance. <u>See</u> <u>Haves</u>, 52 F.3d at 923 ("As long as the City can present at least one plausible, arguably legitimate purpose for the Ordinance, summary judgment for the City is appropriate unless the Appellants can demonstrate that the legislature could not possibly have relied on that purpose."); <u>Federal Communications Comm'n v. Beach Communications, Inc.</u>, 508 U.S. 307, 315 (1993) ("[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it[.]") (internal quotation and citations omitted). As discussed above, requiring Bannum to obtain a special use permit was rationally related to the City's legitimate municipal interests.

### IV. CONCLUSION

---

[4] <u>But</u> <u>see</u> <u>Corn</u>, 997 F.2d at 1387 ("Merely because citizen input may not be a sufficient basis for a rational government land use decision in every instance does not mean it can never be a sufficient basis for such a decision. In most cases it will be.").

9

In closing, we note that Bannum presented some evidence that its CTC participants posed no <u>actual</u> threat to the Fort Lauderdale community. Unfortunately for Bannum, however, controlling precedent limits our inquiry to whether the City <u>could</u> <u>rationally</u> <u>have</u> <u>believed</u> that the CTC participants posed a threat to either public safety or municipal resources.[5] Although we remain somewhat concerned about the manner in which the City handled the zoning of Bannum's CTC, we simply cannot conclude that the City's purported motives were entirely devoid of rationality. Accordingly, we must uphold the zoning ordinance–both on its face and as applied to Bannum–and affirm the district court's summary judgment ruling in favor of the City.

**AFFIRMED.**

---

[5] <u>See</u>, <u>e.g.</u>, <u>Beach Communications</u>, 508 U.S. at 315 (noting that "a legislative choice is not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data").