**OPEN HOMES FELLOWSHIP, INC., Plaintiff,**

v.

**ORANGE COUNTY, FLORIDA, Defendant.**

**No. 6:03CV943ORL31DAB.**

United States District Court, M.D. Florida, Orlando Division.

March 9, 2004.

---

Daniel Riess, U.S. Dept. of Justice, Washington, DC, for Intervenor.

Mathew D. Staver, Erik W. Stanley, Anita L. Staver, Liberty Counsel, Longwood, FL, for Plaintiff.

Rebecca S. Smith, Gary M. Glassman, Orange County Attorney's Office, Orlando, FL, for Defendant.

Temple Fett Kearns, Sidney C. Calloway, Shutts & Bowen LLP, Ft. Lauderdale, FL, Anthony R. Picarello, Roman P. Storzer, Derek L. Gaubatz, The Becket Fund for Religious Liberty, Washington, DC, for Amicus.

### ORDER

PRESNELL, District Judge.

This cause comes before the Court for consideration on the following:

1) Defendant's Motion for Summary Judgment (Doc. 39), Defendant's Memorandum of Law in Support thereof (Doc. 41), and Plaintiff's Response to Defendant's Motion (Doc. 61); and

2) Plaintiff's Motion for Summary Judgment (Doc. 37), Plaintiff's Memorandum of Law in Support thereof (Doc. 38), and Defendant's Memorandum of Law in Opposition (Doc. 63) and Statement of Disputed Material Facts (Doc. 64).

In addition, the United States, as Intervenor, filed a Memorandum of Law in Support of the Constitutionality of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (Doc. 53), and the Becket Fund for Religious Liberty filed an Amicus Curiae Brief in Opposition to Defendant's Motion for Summary Judgment on the Constitutionality of RLUIPA (Doc. 60).

The Court heard oral argument on January 23, 2004.

## I. Background

The following facts are essentially undisputed. In 1984, Pastor Mike Grenier founded Open Homes Fellowship Inc. ("Open Homes" or "Plaintiff"), a religious institution. A main component of Open Homes is the "Regeneration Program," which ministers recovery to persons who are substance-addicted through a 12–step Christian program. While in the Program, the men [1] are not permitted to use drugs or alcohol or commit violence. For the first 90 days of the Program, the men may live at Open Homes for free, but are not permitted to leave designated grounds and are supervised 24 hours a day.[2] First phase men are required to help clean the property.

During the second phase, the men must hold a full-time job but continue to live on Open Homes' grounds for a weekly fee. To leave the property, they must be with at least one other person. All men in all phases take regular classes and gather for worship and prayer meetings. The public, especially families and former clients, is invited to attend weekend worship services.[3]

Upon successful completion of the Program, the men may return to live with

---

1. This Program is for men only.

2. The group residential style of living is important for the recovery process. If a man violates any of the rules once, he is given a warning; twice, he is asked to leave the Program. (Grenier Depo., Doc. 39, Ex. 10, at 15).

3. Grenier testified that Open Homes has always operated as a church. (Doc. 39, Ex. 10, at 58). Open Homes used to hold its Sunday

their families and resume their lives. Alternatively, a successful graduate of the Program may become a "servant leader," who lives in the dorms, helps the other men complete the Program, and assists with the 24–hour supervision. Open Homes is not government-licensed or state-certified to run a drug rehabilitation program.

Open Homes has been in existence since 1984, but only since 1993 has it existed in the Central Park Avenue neighborhood of Orlando, Florida. In 1993,[4] Open Homes purchased the two-building property at 1831 Central Park Avenue. Four years later, Open Homes purchased the properties at 1828 and 1830 Central Park Avenue, which are across the street from the 1831 property. In 2001, Open Homes purchased a vacant parcel adjoining the 1831 property. This lot, located at 1825 Central Park Avenue, remains vacant and unimproved. At the end of Central Park Avenue, there is a soccer complex, for which the only means of ingress is Central Park Avenue.

All of the Open Homes properties are zoned R–3, or "Multiple Family Dwelling District." According to the Orange County Zoning Code ("Zoning Code"), the following uses "shall be permitted" in this district: all R–2 residential district uses (none of which are relevant herein), multiple-family dwellings, boarding and lodging houses, kindergartens and day nurseries, dormitories, fraternity and sororities houses, family foster homes, community residential homes with no more than 14 clients, and single family dwelling transient rentals. Orange County Code § 38–477.[5]

In April 2002, Orange County Code Enforcement received an anonymous complaint about Open Homes operating a drug and alcohol rehabilitation center without a special exception. Open Homes was thus cited for a code violation and was advised it would need to file a special exception application, which Open Homes filed on August 14, 2002. The application sought approval for a "faith-based drug and alcohol recovery program for 16–20 men living

worship service at another church on Orange Avenue. (*Id.* at 60–61). Currently, Open Homes holds all worship services at the Central Park Avenue property. Although the public is permitted to attend the weekend services, typically only former clients and family members attend. (*Id.* at 55).

As proof of the County being on notice that Open Homes has always operated as a church, Open Homes supplied evidence of its tax exempt status for being a "religious" entity. (Crotty Depo., Doc. 39, Ex. 13, attachments). Attached to the tax exemption applications, which are on file with the County, were Open Homes' Articles of Incorporation, which state that Open Homes is a "Christian Church." (*Id.* at Pl.Ex. 3). In addition, Grenier attached a cover letter to the application, which stated "Open Homes Fellowship is a church." (*Id.*)

4. On March 17, 1993, as part of Open Homes' attempt to purchase the 1831 Central Park Avenue property, Dennis Quinn, the real estate broker for the property's seller, wrote a

letter to the County's then Zoning Director Melvin Pittman, asking if Open Homes' proposed use would be permitted in that zone. (Doc. 39, Ex. 19). The Assistant Zoning Manager, Joanne Naumann (formerly McMurray), replied to Quinn on April 13, 1993. (Doc. 39, Ex. 20). Naumann wrote that the property is zoned R–3, and that "this zoning is not consistent with the Low Density Designation of the Comprehensive Policy Plan; however I have been advised the use as proposed has been determined to constitute a bonafide nonconforming use in terms of the Comprehensive Policy Plan." (*Id.*). Naumann testified that the Comprehensive Policy Plan, which classified the land use as low density, was inconsistent with the zoning classification of the land as a higher multi-family density. (Naumann Depo., Doc. 39, Ex. 6, at 13–14).

5. The Orange County Zoning Code was filed as Exhibit 28 to Document 39.

in the existing 3 houses on our property." (Doc. 39, Ex. 30). The Land Development Coordinator issued a Special Exception Report, characterizing the use as "a residential care facility for drug/alcohol rehabilitation." (Doc. 39, Ex. 31). The Report recommended denial of the special exception based on several findings, including: insufficient on-site parking; the location did not front a major highway, as is typical for an institution; the Program was "too intense" for the neighborhood due to noise, traffic, and privacy disruptions; and security and supervision concerns because the Program was not government-licensed. (Id.).

The Board of Zoning Adjustment ("BZA") held a hearing on October 3, 2002, at which various community members testified in opposition that: 1) in the past, sexual predators participated in the Program; 2) Open Homes was actually a business, evidenced by commercial vehicles parked overnight on the street; 3) the Program brought to the neighborhood excessive traffic and garbage; 4) men were allowed to walk in groups unsupervised in the neighborhood; 6) several incident reports had been filed with the police department, giving rise to safety concerns;[6] and 7) the Program would have a negative effect on property value. (Doc. 39, Ex. 1). Various residents also testified generally about their fears of the Open Homes' men, claiming, for example, "I don't know who's watching." (Id. at 67). Similar comments included: "I don't want to bring my kids to the soccer field. It's a wooded area. I don't know who's behind the bush looking." (Id. at 68).[7] The BZA agreed to continue the vote to allow informal resolution between the homeowners and Open Homes.

Because the informal mediation was unsuccessful, the BZA held a second hearing on January 2, 2003, at which the BZA heard testimony on whether Open Homes could be compatible with the neighborhood. Jose Rivas, Jr., spoke on behalf of the community opponents, claiming that they have to live with a "nightmare" (Doc. 39, Ex. 2, at 37), and again highlighting safety concerns, such as "What happened if somebody would have been walking down the street, and this guy was just outraged and snapped and would have hurt somebody?" (Id. at 42). Mr. Rivas' wife, Yanet, also spoke: "I feel … they're watching me, or they're … behind me. I'm afraid. I am afraid for [my daughters] as well." (Id. at 44). Based on the Special Exception Report and testimony from the two hearings, the BZA voted to deny the application.

Open Homes appealed the decision to the Board of County Commissioners ("BCC"), which held an evidentiary hearing on March 11, 2003. The hearing opened with the presentation of a Staff Report by Zoning Manager Mitch Gordon, in which he recommended that the BCC uphold the BZA's decision. He iterated some of the "key factors that led to the finding that Open Homes is incompatible" with the Central Park Avenue neighborhood, including: 1) no government oversight to "see that it's complying with accepted practices and dealing with the types of clients that they would be bringing in there"; 2) safety concerns due to "the transient nature of the facility and because the residents are known to have 'anti-social and criminal behavior activities'";[8] 3) traffic and trash generated by regular garage sales and special events; 4)

---

**6.** These incident reports were filed as Exhibit 33 to Document 39.

**7.** There was no evidence presented that any Open Homes resident was caught in a bush looking at anyone.

**8.** Gordon testified that the Staff Report's finding that Open Homes' clients were antisocial and criminal was gleaned from input from Code Enforcement as well as residents. (Gordon Depo., Doc. 39, Ex. 4, at 54–55). When

intensity due to Open Homes owning multiple dwelling units on the same block; and 5) a general "significant negative impact for the residential community." (Doc. 39, Ex. 3, at 7–8).

Ultimately, after more testimony,[9] the BCC upheld the BZA's denial of the application, because the Program created "excessive traffic, noise and [because it] disrupts the neighborhood" and hence was "incompatible," "too intense," and "intrusive" for the neighborhood. (Doc. 39, Ex. 3, at 51).[10]

Plaintiff thus filed this suit, challenging Orange County Zoning Code § 38–77, and Orange County's denial of a special exception, on several grounds, including: 1) Equal Protection Clause; 2) Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. § 2000cc, et seq.; 3) Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–65 and the Rehabilitation Act, 29 U.S.C. § 794; 4) First Amendment; 5) Florida's Religious Freedom Restoration Act ("RFRA"), Florida Statutes § 761.01.05; and 6) equitable estoppel.

The parties filed cross-motions for summary judgment, which the Court addresses below.

## II. Standard of Review

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Id.* at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the record presents factual issues, the court must not decide them, but rather, must deny the motion and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981).[11]

pressed about the input from Code Enforcement, Gordon testified that Code Enforcement was called to the location on multiple complaints of parking, yard sales, and trash/debris. (*Id.* at 56). The record reveals, however, that Code Enforcement responded to only one anonymous complaint regarding Open Homes' unauthorized operation of a drug and alcohol rehabilitation center.

9. The Rivases again testified about the "transient nature of the facilities" and that the men are "different." (Doc. 39, Ex. 3, at 31, 40).

10. One Commissioner commented, as the motion to deny the special exception, was being made, "I wish we could support them but just, you know, based on the neighbors, I

don't think it would be appropriate ...." (Doc. 39, Ex. 3, at 55). A six-month transition period was recommended.

In addition, although Open Homes staff members had testified that sexual predators no longer were allowed in the Program, one Commissioner commented, "I'm a little concerned about sexual predators that may be housed at the residence at this time with the soccer fields being so close by ... I would hope that that would be taken into consideration and any sexual predators would be removed [during the transition period]." (Doc. 39, Ex. 3, at 55–56).

11. All decisions of the Fifth Circuit prior to October 1, 1981, are binding precedent on

## III. Analysis

■ The Court begins [12] with Plaintiff's equal protection arguments, which are two-fold. First, Plaintiff claims that by denying Open Homes a special exception to operate as a drug and alcohol rehabilitation center, Defendant treated Open Homes differently than similarly situated organizations, and therefore violated Plaintiff's equal protection rights.[13] Second, Plaintiff claims that Defendant treated Open Homes, a church, differently than other similarly situated entities, and hence violated Plaintiff's equal protection rights.[14]

### A. Open Homes as a Drug and Alcohol Rehabilitation Center

■ The first issue before this Court is whether the County may require Open Homes—a drug and alcohol rehabilitation center—to apply for a special permit when other multiple-dwelling facilities may, as of right, locate in an R–3 zone. On this question, *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), controls. In that case, pursuant to a municipal zoning ordinance, the City of Cleburne, Texas, denied to a group home for the mentally retarded a special use permit. *Id.* at 435, 105 S.Ct. 3249. The Fifth Circuit found that the city violated the plaintiff's equal protection rights based upon a quasi-suspect standard of review. The Supreme Court held that the Fifth Circuit's application of a quasi-suspect standard of review was improper, and that rational basis was the appropriate standard for this "economic and social legislation." *Id.* at 442, 105 S.Ct. 3249.[15]

this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**12.** Usually, where a party raises both statutory and constitutional arguments in support of a judgment, a court would first address the statutory argument in order to avoid unnecessary resolution of the constitutional issue. *Blum v. Bacon,* 457 U.S. 132, 137, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982) (citations omitted); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 582–83, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (holding that it was incumbent on the lower courts to consider whether statutory grounds might be dispositive before deciding the constitutional issues). In the instant case, however, the Court finds, for several reasons, that it is more appropriate to address the equal protection arguments head on. These reasons include: 1) the Court, as discussed *infra,* finds that the County violated Plaintiff's equal protection rights on an as applied basis, and thus the Court need not assess whether the code is facially invalid; 2) the Court sees merit in addressing the constitutionality of the County's zoning code before addressing the constitutionality of an act of Congress, RLUIPA. (Indeed, if the Court found that the County had violated RLUIPA, then the Court would have to address the County's challenge to RLUIPA's constitutionality.); and 3) the record is most complete as to the equal protection issues.

*See Beazer,* 440 U.S. at 583 n. 23, 99 S.Ct. 1355.

**13.** *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), instructs that a court should first inquire whether a government violated plaintiff's rights on an "as applied" basis, i.e., whether the government's requirement of a special use permit for the particular plaintiff under the circumstances violates the plaintiff's equal protection rights. *Id.* at 447, 105 S.Ct. 3249. If an "as applied" violation exists, then the court need not assess whether the zoning code is facially invalid, i.e., whether the government may never require a special use permit for the type of entity at issue. *Id.* "This is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *Id.* (citations omitted).

**14.** Although Open Homes functions as a spiritual rehabilitation center, with regard to its equal protection arguments, Plaintiff separates Open Homes' operation as a religious institution from its operation as a drug and alcohol rehabilitation center.

**15.** Generally, legislation is presumed valid and "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.... When social or

Even under rational basis review, however, the Court announced that the state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* at 446, 105 S.Ct. 3249. Under this standard, the Supreme Court found that Cleburne's requirement of a special use permit for the group home but not for apartment houses and hotels, multiple dwellings, boarding and lodging houses, fraternity and sorority houses, dormitories, hospitals, sanitariums, nursing homes for convalescents or the aged, private clubs, fraternal orders, or other uses, violated plaintiff's equal protection rights.[16] The city had no "rational basis for believing that the ... home would pose any special threat to the city's legitimate interests" and therefore held the ordinance invalid as applied. *Id.* at 448, 105 S.Ct. 3249.

Based on *Cleburne*, this Court must first assess whether the uses for which Defendant does not require special permits—*inter alia* community residential homes, adult daycare centers, and dormitories—are similarly situated to Open Homes' use as a drug and alcohol rehabilitation center. *See Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1359 (6th Cir. 1992) ("It is the similarity of the use, and the zoning regulation's requirement of a conditional use permit for some uses but not for others, that is the subject of constitutional scrutiny. Different treatment is the initial element of an equal protection violation.") (citing *Mackenzie v. City of*

*Rockledge*, 920 F.2d 1554, 1559 (11th Cir. 1991)).

The Orange County Code defines "community residential home" as "a dwelling unit licensed to serve clients of the state department of health and rehabilitative services, which provides a living environment to unrelated 'residents' who operate as the functional equivalent of a family, including such supervision and care by support staff as may be necessary to meet the physical, emotional, and social needs of the 'residents.'" Orange County Code § 38–1.[17] The only discernable difference between a community residential home and Open Homes is that Open Homes is not licensed and does not serve clients of the State's department of health and rehabilitative services. For equal protection purposes, this difference does not render Open Homes dissimilar from a community residential home.

The Code defines "fraternity," "sorority," and "club" as "buildings, facilities and property owned and operated by a corporation or association of persons for social or recreational purposes, including those organized chiefly to promote friendship and welfare among its members, but not operated primarily for profit or to render a service which is customarily carried on as a business." *Id.* This definition could also describe Open Homes, except Open Homes' "association of persons" is primarily for the purpose of drug and alcohol rehabilitation.

---

economic legislation is at issue, the Equal Protection Clause allows the States wide latitude .... The general rule gives way, however, when a statute classifies by race, alienage, or national origin.... these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249 (citations omitted).

**16.** Notably, in *Cleburne*, the city classified this group home as a "hospital for the feebleminded." 473 U.S. at 436–37, 105 S.Ct. 3249. Under Cleburne's ordinance, homes for the insane, feebleminded, alcoholics, and drug addicts were required to obtain special use permits. *Id.* at 447, 105 S.Ct. 3249.

**17.** This was filed as Exhibit 28 to Document 39.

A "dormitory," which is defined as "a room, apartment or building containing sleeping accommodations which is operated for the use of students enrolled in an educational institution" *id.*, also is not distinguishably different from Open Homes. The fact that Open Homes' "education" focuses on drug and alcohol rehabilitation is not significant.[18]

A "daycare center," defined as "a structure in which the owner or operator, for compensation, provides supervision and temporary care for more than ten (10) persons, who are not related by blood or marriage and not the legal wards or foster children of the owner or operator," *id.*, is similarly situated to Open Homes. Like a daycare center, Open Homes provides supervised care (some of which is for compensation) for more than 10 persons not related by blood or marriage.[19]

As the above analysis reveals, but for the fact that Open Homes' residents are recovering drug and alcohol addicts, if Plaintiff was operating its Program as any of these other uses, it would be allowed in an R–3 zone as of right.

■ Nonetheless, Defendant attempts to couch its denial of the special exception in terms of several rationales. The Court now must determine whether, under the lenient rational basis test, Defendant has proffered any rational basis for believing that Open Homes would pose a special threat to the County's articulated interests of safety, traffic and trash control, intensity of use, and general prevention of disruption to the neighborhood. *See Cleburne*, 473 U.S. at 448, 105 S.Ct. 3249 (holding that the city had no rational basis for believing that the plaintiff's home

would pose a special threat to the city's legitimate interests); *see also Bannum, Inc. v. City of Fort Lauderdale*, 157 F.3d 819, 824 (11th Cir.1998) (concluding that the inquiry is whether the government could rationally have believed that the plaintiff poses a threat to the government's proffered interests, in that case public safety and municipal resources).

■ First, there is no doubt that safety is a legitimate government interest. *Id.* at 823. However, Defendant has not proffered any rational basis for believing that Open Homes poses a special threat to this interest. In this regard, *Cleburne* is again instructive. In *Cleburne*, the city council improperly bowed to the fears of nearby property owners and elderly residents, who were concerned about the group home's proximity to their own homes and to a junior high school, as well as legal responsibility for the actions of the group home's occupants. The Court held that the

> mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like.... the City may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.

*Id.* at 448, 105 S.Ct. 3249; *see also Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Ad-*

---

**18.** Gordon testified that a dorm differed from Open Homes because of "the element of students and being enrolled in an educational institution[ ]" and that Open Homes is not certified or accredited as a school. (Doc. 39, Ex. 4, at 44–45).

**19.** Defendant also compares Open Homes to certain other entities, such as temporary model homes and home occupations. Plaintiff did not allege that these uses were similarly situated, so the Court does not address them.

*min.,* 740 F.Supp. 95, 107 (D.P.R.1990)[20] (noting "promising analogy" between its facts—denial of a special permit to an AIDS center based upon the unfounded stereotypical views of the public—and *Cleburne*). The Court also found that the fears about the junior high school were "vague and undifferentiated" and thus an improper basis for denying a permit.[21] Further, the Court wrote:

> If there is no concern about legal responsibility with respect to other uses that would be permitted in the area, such as boarding and fraternity houses, it is difficult to believe that the groups of

mildly or moderately mentally retarded individuals who would live at [the home] would present any different or special hazard.

473 U.S. at 449, 105 S.Ct. 3249.[22] Ultimately, the Court held that the city's permit requirement for that group home rested on "irrational prejudice against the mentally retarded" and therefore that the zoning ordinance was invalid as applied to the group home. *Id.* at 450, 105 S.Ct. 3249.

Similarly, in the instant case, the County appeared to base its safety concerns on the unsubstantiated[23] negative attitudes of

---

**20.** In *AIDS Patients,* an FHA case, the plaintiff argued that the city based its decision to deny a special permit to an AIDS treatment center on irrational fears. The defendant argued that there were no such expressions of irrational fear because no public hearing was held, and in any event, community members' statements could not be attributed to the defendant. The court found that, while a decisionmaker should not be

> saddled with every prejudice and misapprehension of the people he or she serves and represents [,] a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process. A .. discriminatory act would be no less illegal simply because *it enjoys broad public support.* Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter.

740 F.Supp. at 104 (emphasis omitted). The court also found that direct statements by public officials at a public hearing were not the sole means to prove discriminatory intent in an FHA case; circumstantial evidence, such as citizens' statements, also could prove discriminatory intent.

In the instant case, Plaintiff need not show discriminatory intent to establish an equal protection violation, but the Court notes nonetheless that in this case, an argument of discriminatory intent would be even stronger than in *AIDS Patients.* Here, there were

three public hearings, so the record is replete with evidence of the views of the people who the BZA and BCC serve and represent. Moreover, not only did the public express strong negative views on the matter, but there is record evidence that the decisionmakers and advisors to those decisionmakers subscribed to those views, and relied upon them in their decisionmaking.

**21.** Ironically, 30 mentally retarded students attended the junior high school, which diluted any stated fear that the students might be harassed by the home's occupants. *Cleburne,* 473 U.S. at 449, 105 S.Ct. 3249.

**22.** The Court also found that concern regarding general neighborhood serenity and danger to residents failed to meet the rational basis test. 473 U.S. at 450, 105 S.Ct. 3249.

**23.** The negative attitudes of those who testified at the hearing are based on speculation. For example, Yanet Rivas swore in her Affidavit that she has seen "many men from Open Homes walking up and down Central Park Avenue. These men give me nasty looks, and have made what I believe are insulting comments to me." (Doc. 39, Ex. 21, at ¶ 3). Similarly, Jose Rivas, Jr. swore in his Affidavit, "The men from Open Homes have verbally attacked me, and *would have* started physical confrontations had I not retreated." (Doc. 39, Ex. 22, at ¶ 5) (emphasis added); (*See also* Urena Depo., Doc. 39, Ex. 12, at 10: "No incident as of yet. Just looks. And, that's what [my daughters] tell me."; and Doc. 39, Ex. 3, at 41: "I haven't seen any

community opponents who vocalized their opinions. As in *Cleburne*, the County improperly deferred to the objections of a fraction of the body politic and illegally gave these biases effect.

In addition, there is no record evidence to suggest that because Open Homes' men are recovering addicts they present a special safety threat. On this issue, *Sullivan v. City of Pittsburgh*, 620 F.Supp. 935 (W.D.Pa.1985),[24] is instructive. Following a bench trial, *Sullivan* held that the city council's decision to deny the conditional use application of an alcohol recovery center violated plaintiffs' equal protection rights and that singling out people in the process of drug and alcohol addiction recovery is unconstitutional. *Id.* at 937, 945. The court found that alcoholism was a disability and handicap and that alcoholics had long been subject to societal prejudice,

including resistance to accepting recovering alcoholics in their communities. *Id.* at 941–42. This prejudice was unfounded, for "[t]he evidence preponderates that a recovering alcoholic is as likely to be a responsible citizen and good neighbor as a non-alcoholic person." *Id.* at 942. The court further noted the importance to recovery of group residential treatment in a community setting. *Id.* Based on these findings of fact, the court concluded that the city's rejection of the center's special use application was not rationally related to a legitimate government purpose[25] but instead was based upon unfounded fear, speculation, and prejudice.[26] *Id.* at 944 (citing *Cleburne* ).

Similarly, in the instant case, the County presented no evidence that a person recovering from a drug or alcohol addiction poses any more of a threat to safety than a non-addict.[27] *See City of Louisville*, 958

---

major problem but that doesn't mean that it's not going to be.").

As these comments make clear, no neighborhood resident has suffered from a physical attack or other incident, but rather only from alleged verbal comments and "looks."

Moreover, the general safety concern due to men supposedly wandering the street and congregating cannot be directly linked to Open Homes, for most of the opponents testified that they could not identify the men. (*See, e.g.*, Doc. 39, Ex. 1, at 65: "We don't know who they are."; Kalmowitz Aff., Doc. 39, Ex. 27, at ¶ 4: "I am concerned with the large number of unknown men who appear in the neighborhood.... Many of these men enter the residence next to mine which is owned by Open Homes. However, since I do not know any of these men, I am unsure whether they are residents at Open Homes."; Doc. 39, Ex. 2, at 44 "You never see a familiar face. It's always different people."). At least some of this foot traffic of unknown persons could be generated by the soccer complex.

In addition, some of the incidents that gave rise to the residents' general suspicions and fear are wholly unfounded. For example, Yanet Rivas wrote that "Wesley Carlson ... came to my door, knocked, and claimed that he had a piece of mail for our home. This was very suspicious as we have never before

had our mail wrongly delivered." (Yanet Rivas Aff., Doc. 39, Ex. 21, at ¶ 6). Regardless of Ms. Rivas' experience, it is not infrequent in any neighborhood to have mail delivered to the incorrect address. Any fear generated by a person returning said mail is irrational.

**24.** The Court recognizes that *Sullivan* is almost twenty years old and non-binding. Nonetheless, the Court finds its logic and reasoning persuasive.

**25.** The court applied a rational basis test, based on *Cleburne*.

**26.** The court found the government's stated purposes to be pretextual, including: 1) intensity, i.e., concern over the number of group homes in the area; 2) impairment of property values; and 3) light, air, and noise concerns. These concerns are similar to those articulated by the County herein.

**27.** The County submitted as evidence police "incident reports" to show that the Open Homes men posed a threat to the neighborhood. None of these incidents were significant (e.g., "suspicious incident," "contact," "attempt to contact," "trespass"), (Doc. 39, Ex. 33), and in fact many of the reports were generated because Open Homes itself phoned

F.2d at 1360–61 (finding that the city had failed to present evidence in support of its justification that occupants of a community treatment center ("CTC") for felony offenders were more likely to commit crimes than persons not previously convicted, and holding that the city's distinction was therefore arbitrary and irrational).[28] Any safety concern related to the men being recovering addicts is therefore based upon unfounded fear, speculation, and prejudice.[29] Admittedly, Open Homes accepts some referrals from local prisons,[30] but the Program requires the men to remain nonviolent upon threat of being asked to leave. (Doc. 39, Ex. 10, at 34–35, 79).[31] Moreover, there is no evidence that the "incidents"[32] documented in the police incident reports were greater in number and intensity than incidents linked to similarly situated uses, such as dormitories, fraternities, or sororities, in which college students might reside. Even the worst "incident" reported, when an Open Homes client damaged a van window, was not performed against a neighbor's property but rather against Open Homes' own property. Finally, Open Homes itself was responsible for many of the calls to the police because, upon learning of a probation violation or outstanding warrant, Open Homes' policy is to phone the police to have the man arrested. (Doc. 39, Ex. 10, at 90; *see also id.* at attached Composite Ex. 3).[33]

For all the foregoing reasons, the Court finds that the relationship between the County's asserted goal of safety and its ultimate decision to be so attenuated as to render the distinction between Open Homes and other similarly situated uses— such as community residential homes, daycare centers, and dormitories—as arbitrary or irrational.

■ Second, there is no rational basis for the County's denial of the special exception based on traffic and related trash problems. Traffic and trash control are legitimate government interests. *Love Church v. City of Evanston,* 671 F.Supp. 515, 519 (N.D.Ill.1987) (holding that traffic concerns are legitimate but not compelling interests); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F.Supp.2d 961, 978 (N.D.Ill.2003) (referring to *inter alia* traffic and parking prob-

---

the police to report clients who might be wanted or otherwise in violation of the law.

**28.** The court found that the real reason for treating the CTC differently than other similarly situated entities was so that the neighborhood opponents "would not find themselves with a CTC as a neighbor." 958 F.2d at 1361. The court so found based upon the "lack of data supporting the city's contention that the incidence of crime is inflated in areas containing CTCs" as well as the record evidence of substantial and vocal community opposition. *Id.* In this regard, *City of Louisville* is similar to the instant case.

**29.** Many of the homeowners simply assumed that Open Homes' recovering addicts would continue to abuse drugs and alcohol. (*See, e.g.,* Reyes Aff., Doc. 39, Ex. 25, at ¶ 5: "I'm afraid of what drugs can do to a person and how they can make him act."). The point of the Program is, of course, to help men to *overcome* their habit and *reverse* their ways.

Moreover, the Program disallows any use of drugs or alcohol.

**30.** Wesley Carlson of Open Homes swore in his Affidavit that approximately 26 percent of the men are referred from state probation and parole officers, churches and ministers, and family members. (Doc. 67 at ¶ 11).

**31.** Many homeowners, and even some Commissioners, expressed concern about Open Homes allowing sexual predators into the Program. Grenier testified that they stopped allowing sexual predators as clients some time ago. (Doc. 39, Ex. 10, at 79).

**32.** A Board member even pointed out during the BZA's first hearing that most of the incidents reported were "of a minor nature." (Doc. 39, Ex. 1, at 61).

**33.** Included in Composite Exhibit 3 to Grenier's Deposition is a list of the rules and regulations for Open Homes' entrants.

lems as "important"). However, the Court fails to see how a drug rehabilitation center poses any greater threat of traffic and trash problems than a community residential center, daycare center, or fraternity. *See, e.g., Love Church,* 671 F.Supp. at 519 (finding that church posed no greater traffic problem than a funeral parlor, whose traffic level depends on "the vagaries of who died."). As in *Love Church,* the County herein also has not proffered any reason why it could not regulate traffic on Central Park Avenue in a similar way it regulates other traffic congestion problems elsewhere. *Id.* Moreover, the record indicates that Open Homes voluntarily has sought to alleviate many of the traffic and trash problems, for example by eliminating the weekly garage sales and the parking of commercial vehicles on the street.[34]

Finally, the concern that the multiple-property Open Homes is too intense for the neighborhood is not rational and may in fact be disingenuous. Jose Rivas, Jr., testified that his family owns a "substantial amount of property on this street.... My intention is ... to build homes on this property [for my brothers and their families]." (Doc. 39, Ex. 3, at 35–36). The Court sees no difference between the intensity of Open Homes owning and developing multiple properties on one street and the intensity of Mr. Rivas and his family owning and developing multiple properties on one street. Moreover, the Court fails to see how Open Homes is any more intense of a use than a dormitory, fraternity, or sorority, which allow for housing of students who are generally known to come and go at all hours of the day and night and hold regular gatherings.[35]

■ In addition to its fact-based arguments, Defendant advances several legal arguments to suggest that it is not violating Open Homes' equal protection rights. For example, Defendant contends that because Florida law mandates that day care businesses and centers shall be permitted in a residential district zone without first obtaining a special use permit, the County was not treating Open Homes differently on its own accord. The fact that Florida law demands treatment of a certain type of entity and therefore that "the County has no choice" (Doc. 63 at 2) does not mean, however, that the County has not violated the Constitution by treating similarly situated entities differently.

■ Similarly, Defendant argues that pursuant to Florida Statute § 419.001(3)(b), the County may review and deny the location of a community residential home, which is permitted in an R–3 zone without a special use permit. Because the County still has authority to deny approval of the home location, the County contends it is not treating community residential homes differently than drug and alcohol treatment programs. This argument also lacks merit, for the fact remains that Open Homes was required to seek a special permit, which was denied, whereas a community residential

---

**34.** In any event, community opponents seem to have inflated the traffic and trash problem. One such special event that generated additional traffic and garbage, for example, was a birthday party for Pastor Grenier. In addition, as stated above, much of the traffic might be attributable to the soccer complex located at the end of Central Park Avenue.

Further, Grenier testified that Rivas blamed Open Homes for garbage being thrown in his yard. Grenier informed Rivas that it was not Open Homes' men who were responsible but raccoons. In fact, after Grenier fenced in the garbage, the garbage problem ceased. (Doc. 39, Ex. 10, at 75–76).

**35.** Gordon testified that "parking cars, noise, those kinds of things. We deal with that with student housing all the time." (Doc. 39, Ex. 4, at 58).

home would have been permitted as of right.

Moreover, there is evidence that the city treated Open Homes differently than another drug and alcohol center, which applied and received a special exception even though it was located in a residential neighborhood. (*See, e.g.*, Doc. 39, Ex. 3, at 57–58).[36]

■ Based upon the foregoing analysis, the Court finds that Defendant violated Plaintiff's equal protection rights on an "as applied" basis.[37] Where, as here, the County failed to present a rational relationship to a legitimate state interest in its differential treatment of Open Homes, "injunctive relief is the appropriate remedy against the unconstitutional application of the regulations." *City of Louisville*, 958 F.2d at 1361.

## B. Open Homes as a Church

Plaintiff also argues that requiring Open Homes—a religious institution—to obtain a special exception to operate in this R–3 zone but not other similarly situated enti-

ties violates Plaintiff's equal protection rights.[38]

■ Before assessing whether Open Homes' equal protection rights have been violated in this regard, however, the Court must determine whether this claim is ripe for adjudication. The record is clear that Open Homes' application for a special exception sought approval for a "faith-based drug and alcohol rehabilitation center," not for operation of a "church." (*See, e.g.*, Doc. 39, Ex. 3, at 4).[39] What is needed, however, for this case to proceed is not a showing that all administrative remedies were exhausted but "that proceedings have reached some sort of an impasse and the position of the parties has been defined." *City of Louisville*, 958 F.2d at 1362 (announcing that finality, not the exhaustion of remedies, is "the appropriate determinant of when litigation may begin."); *see also MX Group, Inc. v. City of Covington*, 293 F.3d 326, 343 (6th Cir.2002).[40] In this case, even though Open Homes has not sought a special exception to operate as a church or religious institution, the record

---

**36.** One Commissioner commented at the March 11, 2003, BCC Hearing that he had, in the past, had to deal with a similar situation in which a drug and alcohol rehabilitation center wanted to locate in a residential neighborhood. He said, "we handled it 110 percent different than the way we are handling it today. That center is still open today and the residents are still mad as hell today, but things have generally worked out.... I'm saying this just to ... wake up someone's memory so that we can kind of be a little bit consistent." (Doc. 39, Ex. 3, at 57–58).

**37.** Due to this finding, the Court need not determine whether the code is facially valid. Hence, this Court does not hold that the County may never require a special exception for a drug and alcohol rehabilitation center.

**38.** Open Homes did not learn of its code violation for operating a church without special exception until Orange County issued the violation *after* this lawsuit was filed.

**39.** "Faith-based" was not defined, but there is no dispute that Open Homes has operated as a religious institution from the outset.

**40.** In *MX Group*, plaintiff filed suit prior to requesting a conditional use permit. The court found, however, that the record revealed that

such a request would have been futile, especially in light of the fact that the ... ordinance effectively prohibited clinics such as Plaintiff's clinic from opening anywhere in the city. As Plaintiff had already faced substantial opposition from city administrators, including the Board of Adjustment, before Plaintiff filed this suit, and ultimately any remedy Plaintiff sought likely would have been futile, we hold that Plaintiff sufficiently exhausted its administrative remedies before filing this suit.

293 F.3d at 343.

reveals that the proceedings have indeed reached an impasse and the parties' position have been defined. Like the *City of Louisville* court, this Court hesitates to put up a barrier to litigation "when it is obvious that the process down the administrative road would be a waste of time and money." 958 F.2d at 1362.[41] Therefore, the Court will adjudicate Plaintiff's claim with regard to Open Homes' operation as a religious institution.

■■■ The appropriate standard of review for analyzing the County's treatment of Open Homes as a religious entity is not necessarily rational basis. *See Vineyard,* 250 F.Supp.2d at 978 (holding that a higher standard of review was warranted due to the city drawing a classification that disadvantaged a constitutionally suspect class, a religious institution, but acknowledging that other courts had used a rational basis test); *see also Love Church,* 671 F.Supp. at 517–19 (setting forth general suspect-class standard of review and concluding that the ordinance therein classified on the basis of religion). This Court need not determine which standard of review is appropriate herein, for the County's rationale for treating Open Homes differently than the other similarly situated uses does not even pass rational basis review.

Indeed, as above, the Court finds no rational basis for believing that Open Homes' religious operations pose any greater safety, traffic, and disruption threats to the Central Park Avenue neighborhood than a fraternity, sorority, or club, for example. The only potentially distinguishable difference between Open Homes' operation as a religious institution and a fraternity, sorority, or club is that Open Homes' residents assemble for prayer, religious classes, and worship services, not solely for recreational or social purposes.[42] Moreover, the weekend worship service open to the public but particularly former clients and family is not discernably different than a club's weekly meeting at which non-residents are welcome.[43]

In *Vineyard,* the court had occasion to determine the constitutionality of requiring a religious institution to obtain a special permit in a certain zoning district whereas cultural facilities, for example, were permitted as of right. The court began by asking whether the ordinance, as applied, was "precisely tailored to serve a compelling governmental interest" because the legislative classification at issue negatively affected a suspect class, i.e., religious institutions were being treated differently from their similarly situated counterparts. 250 F.Supp.2d at 975 (internal quotation and citation omitted).

---

**41.** In *City of Louisville,* the court found that the city's opposition to the CTC was pervasive, and therefore it was not unreasonable for the court to find that any further administrative proceeding would have been unproductive. 958 F.2d at 1363. In the instant case, Open Homes endured two BZA hearings, and an appellate BCC hearing. The church aspects were not fully explored, but the Court cannot fathom any valid additional concerns that would require further evidence to address the religious aspects of Open Homes.

**42.** Gordon testified that the code does not include in a club's definition "any religious

aspect ... I would consider religious aspects different than social or recreational." (Doc. 39, Ex. 4, at 46). Further, he testified that "a club is for social and recreational purposes. I think social and recreational purposes are more or less ancillary to a religious institution whose primary purpose is espousing religious beliefs and the prayer associated with it[.]" (*Id.* at 47).

**43.** Gordon answered in the affirmative when asked if it was normal, customary, and proper for residential uses and fraternities and sororities to have parties and gatherings at their dwellings, as long as they were not charging admission. (Doc. 39, Ex. 4, at 58).

The court then assessed whether the ordinance furthered a compelling interest and whether it was narrowly tailored to meet those interests. The city listed as "interests" traffic and parking problems; the need to encourage business in the area to increase tax revenue to compete with more affluent neighbors; and the need to create more office space in the district. *Id.* at 977. The court found that the goals were "important," "understandable" and "acceptable" but that as applied, the ordinance did not advance those goals.

The court also opined that even under a rational basis test, the plaintiff's equal protection rights had been violated. *Id.* at 978. Relevant herein, the court found it was not rational to treat worship services differently than a Masons' meeting, for example, *id.* at 979, and that in fact some of the uses permitted as of right actually posed more of a traffic and parking congestion threat. *Id.*

The same analysis applies herein. The County had no rational basis to treat Open Homes differently than, for example, a fraternity, sorority, or club, which are allowed to locate in an R–3 zone without special exception.[44] Even if traffic and trash are valid government interests for restricting the location of a religious insti-

tution, the County's denial of a special permit to Open Homes is not rationally related to serve these interests, for there is no record evidence that Open Homes' religious operation—which is mainly limited to the men, their families, and former clients—poses a greater traffic or trash threat than a fraternity, sorority, or club. *See Konikov v. Orange County,* 302 F.Supp.2d 1328, 1350 (M.D.Fla.2004) (rejecting plaintiff's argument that his equal protection rights were violated in large part because plaintiff held religious services much more frequently (several times per week) than other religious institutions who were allowed in residential neighborhoods). Moreover, for essentially the same reasons as announced above, there is no evidence that Open Homes' religious activities present any greater safety threat or disruption to the neighborhood than any of the uses permitted as of right.

For all these reasons, the Court finds that, as applied, the County's ordinance on religious institutions violated Open Homes' equal protection rights.

## IV. Conclusion

For all the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 37) is **GRANTED**, and Defendant's Motion for

---

**44.** Defendant cites *Christian Gospel Church v. City and County of San Francisco,* 896 F.2d 1221 (9th Cir.1990). In that case, the Christian Gospel Church applied for conditional use authorization to operate its church in a single-family residence in a neighborhood zoned for single families only. The city planning commission denied the application because the church posed noise, traffic, and parking problems and it would adversely affect the neighborhood's character. *Id.* at 1223. The court held that the church's equal protection rights were not violated as applied or on its face. The code in that case, however, required that "[a]ll assembly-type activities, such as schools, churches and community centers, in this particular zone [to obtain] conditional use permits." *Id.* at 1225 (em-

phasis added). In the instant case, clubs, fraternities, and sororities are assembly-type entities, but they are permitted as of right. Moreover, in *Christian Gospel Church,* the city granted conditional use permits on 30 applications but rarely granted them in the neighborhood at issue because of the otherwise quiet neighborhood's concerns about noise and traffic. There was no record evidence with regard to the number of applications the County granted to churches in similar multi-family dwelling neighborhoods, but there was evidence that Open Homes had existed without issue for over 10 years, and that prior to Open Homes purchasing the property, a fraternity house had operated there.

Summary Judgment (Doc. 39) is **DENIED**. The Court will enter judgment for the Plaintiff in a separate order consistent with this opinion.